# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Faber*, 2012 IL App (1st) 093273

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARL FABER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-3273 |
| Filed | June 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for first degree murder and aggravated battery with a firearm, the appellate court rejected defendant's contention that the trial court erred in refusing to allow defense counsel to question a detective about a bystander's identification of another man as the shooter, even though section 115-12 of the Code of Criminal Procedure allowed such testimony, since the error was harmless where the identification of defendant as the shooter was proved beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-1517 (03); the Hon. Steven J. Goebel, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Kerry Goettsch, all of State Appellate Defender's Office, of Chicago, for appellant. |

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, William L. Toffenetti, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.

Presiding Justice Quinn and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant, Earl Faber, appeals his conviction after a jury trial of first degree murder and aggravated battery with a firearm, and his respective sentences of 60 years' and 25 years' imprisonment to be served consecutively. On appeal, Faber contends he was denied a fair trial where (1) the trial court erred in relying on the prosecutor's misstatement of the law and preventing his counsel from eliciting identification testimony from Sergeant Flaherty; (2) his trial counsel provided ineffective assistance by failing to prepare for the case, failing to elicit exculpatory evidence, and not producing evidence promised to the jury during opening remarks; (3) the trial court erred in denying his motion to suppress his identification in two photo arrays where the arrays were lost by the State, foundation testimony was inconsistent, and the later lineup was suggestive; and (4) the lineup in which he was identified was unduly suggestive since he was the only participant wearing the clothing the offender was described as wearing and physically stood out from the others. For the following reasons, we affirm.

¶ 2 JURISDICTION

¶ 3 The trial court sentenced Faber on October 15, 2009, and he filed a timely notice of appeal on November 13, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4 BACKGROUND

¶ 5 Faber, along with James Lenoir, Donald Phillips, and Leondray McClellan, was charged in the shootings of Deonte Wright and Jose Perez. Wright died from his injuries. The trial court granted Faber's motion to sever his trial from that of the other defendants.

¶ 6 Prior to trial, Faber filed a motion to suppress the testimony of two witnesses who had

viewed a photographic array in which they identified Faber as the shooter. He also sought to suppress witnesses' identification of him from the lineup, arguing the lineup was unduly suggestive. At the hearing, Detective Flaherty testified that on September 17, 2003, witnesses Martha Christopher and Willie Stallworth were shown a photo array containing a photograph of Faber. Detective Flaherty described the photos as head and shoulder shots, approximately the size of a piece of 8 x 11 inch paper. They obtained photos of other subjects from Chicago police computer records. The photos are closely matched by gender, race, age, and facial features. Detective Flaherty went to the residences of Christopher and Stallworth and showed them an array containing a photograph of Faber and five "fillers." He asked them to look through it to see if they recognized anyone. He did not tell them that he believed a photograph of one of the offenders was in the array. Both Christopher and Stallworth selected a photograph of Faber from the array. The selected photo was dated and signed by the witnesses and by Detective Flaherty. He stated that the last time he saw the photos of Faber was October 2003.

¶ 7        On September 19, 2003, Stallworth, Mrs. Christopher, Mr. Christopher, Mr. Nzau, and Mr. Reap came to the police station to view a lineup. At one point, the witnesses sat together in the same room but later they were separated. The lineup contained two codefendants, James Lenoir and Donald Phillips, as well as Faber. Detective Flaherty informed Faber that he would be placed in a lineup and asked him to pick a position in the lineup. He wore his civilian clothes. The witnesses viewed the lineup one at a time. Mrs. Christopher, Mr. Christopher, and Mr. Stallworth picked Faber out of the lineup. At no time were witnesses told that the shooter was in the lineup.

¶ 8        At the hearing, Faber testified that while he was in custody at the police station, he saw his clothes in a bag. The police told him he would be in a lineup and was given only his jeans and an undershirt to wear. He was not given his "tee shirt, jacket, [or] [his] hat." He was not asked where he wanted to sit in the lineup. Instead, others were already seated and there was "a place for [him] to sit once [he] got there." He did not voluntarily participate in the lineup, nor was he offered a phone call. During the lineup, the participants were asked one by one to step up to the two-way mirror and turn left and right. After going through all the participants, they performed the lineup procedure again. Faber stated that "the second time they ran the lineup it was like I was up there longer than the first time."

¶ 9        The trial court denied Faber's motions, finding that the lineup was not suggestive and the procedure using the photographic array was fair. It accepted the testimony of Detective Flaherty, finding him to be a credible witness. It also believed that the State's loss of the photographs was inadvertent and the State diligently attempted to find the photos once it realized they were missing. No one told the witnesses which photo to select or that the offender's photo was in the array. It stated that it would not "preclude the State from going into the photographic array."

¶ 10       At trial, Officer Kusinski testified that on September 16, 2003, he was conducting narcotics surveillance a few blocks from the intersection of Madison and Western in Chicago, Illinois, when he heard approximately six gunshots in the area. He ran to where he heard the shots fired and saw a lot of people running away. He fought his way through the intersection and found the victim, Deonte Wright, lying on Madison Street in front of a white

Blazer. Officer Kusinski called for an ambulance and officer assistance. He observed another victim in the driver's seat of a yellow Camaro with a gunshot wound to his head.

¶ 11    Jose Perez testified that he had been driving northbound on Western when he stopped at the intersection of Western and Madison. He suddenly felt a hot sensation in his head and then awoke in a hospital.

¶ 12    Wright died from his injuries. One shot entered the front right side of his neck, traveled through his Adam's apple, hyoid bone, tongue, and the roof of his mouth to the skull and brain and partially exited the left top side of his head. He also suffered gunshot wounds to the left side of his head, his left arm, left buttock, and the left side of his abdomen. Perez survived, underwent surgery and had a metal plate inserted in his head.

¶ 13    Several witnesses testified regarding the shooting. Willie Stallworth testified that shortly after 3 p.m., he was driving his white Chevrolet Blazer when he stopped at a light at the intersection of Madison and Western. A lot of people were getting out of school. A man approached his vehicle from the left, passed behind and continued along the passenger side. Stallworth watched the man from his side-view mirror. He then observed Wright run south toward a vacant lot to his left. Wright ran in front of Stallworth's vehicle and he saw the man shoot Wright twice. Wright fell in front of the Blazer and the shooter walked up to him, put his gun under Wright's chin, and shot again. No one else shot at Wright. Stallworth testified that the offender was no more than five feet from his Blazer when he shot Wright. After shooting Wright, the man looked directly at Stallworth, turned and walked southbound. Stallworth identified Faber in court as the shooter. The following day, a detective came to his residence and showed him some photographs. From the photo array, Stallworth identified Faber as the shooter. He also identified Faber in a lineup conducted at the police station on September 19, 2003.

¶ 14    Michael Christopher testified that he had parked in a vacant lot so his wife could visit a shoe stand operated by Innocent Nzau on the southeast corner of Madison and Western. As he waited for his wife, he observed a two-tone blue Chevy park in front of him. Four people were inside the vehicle. The two rear passengers exited the vehicle and one of the men was holding something in his hand, but Mr. Christopher could not see the object. He exited his car and watched as the man pointed the gun toward the people at the bus stop. He heard gunshots and tried to get his wife's attention. He then saw Wright fall in front of a white sport utility vehicle facing west on Madison. The man with the gun stood over Wright, aimed at his head and shot him again. The shooter then walked past Mr. Christopher's car and back to the blue vehicle. Mr. Christopher did not identify the shooter.

¶ 15    Martha Christopher testified that she was looking at shoes when she noticed her husband pointing out something to her. She looked to where he was pointing and saw a man raise his arm and shoot in the direction of a bus stop. She observed Wright run onto Madison Street toward her. The offender continued to shoot at Wright and Wright fell in front of a white Blazer. The man stood over Wright and shot him again. The shooter smiled and walked south toward the vacant lot. He passed her husband's vehicle but she did not see where he went afterwards. Mrs. Christopher described the offender as "tall, dark-skinned. He had a Dago-T on and a pair of jeans." She stated that a Dago-T was "a T-shirt that doesn't have sleeves."

When police visited her residence the next day, she viewed six photographs contained on a single page. She identified Faber from the array and also identified him in a lineup at the police station. At trial, she identified Faber as the man she saw holding a gun.

¶ 16       Innocent Nzau testified that he was helping Mrs. Christopher find some shoes when he heard gunshots coming from the area of Madison and Western. He observed Wright in the street with the shooter standing over him. The shooter then shot at Wright's head as he was on the ground, and then ran behind Nzau's van. Nzau acknowledged that he did not get a good look at the shooter because he had to hide behind his display as the shooting occurred. During cross-examination, defense counsel asked Nzau whether he was unable to pick the shooter out of the lineup and he responded, "I give a probability." After a sidebar, defense counsel asked Nzau if he could "make a hundred percent certain identification of any person in that line-up" to which he answered, "Hundred percent, no."

¶ 17       Before Detective Flaherty took the stand, the State asked the trial court to admonish defense counsel that he not raise the issue of Nzau's identification of Donald Phillips when he viewed the lineup. The trial court agreed with the State since the subject of his identification never arose during Nzau's testimony at trial.

¶ 18       Detective Flaherty testified that he interviewed witnesses including Stallworth, Mr. and Mrs. Christopher, and Nzau at the police station after the shooting. Detective Flaherty put together separate photo arrays each containing a picture of Faber along with five other people. On September 18, 2003, he went to Mrs. Christopher's residence and showed her one photo array. She identified Faber as the shooter. He also went to Stallworth's residence that day and showed him another photo array from which he identified Faber as the shooter. Detective Flaherty stated that the arrays were inventoried and turned over to the assistant State's Attorneys. He acknowledged that the photo arrays have since been lost.

¶ 19       On September 18, 2003, codefendant James Lenoir was arrested. Codefendant Phillips was arrested on September 19, 2003, and Faber was also arrested that day. That afternoon, the police conducted a lineup that included Faber, Lenoir, Phillips and three fillers. Stallworth, Mr. and Mrs. Christopher, and Nzau came to the police station and separately viewed the lineup. Stallworth identified Faber in the lineup as the one who shot Wright. Mrs. Christopher also identified Faber as the man who shot Wright. Mr. Christopher and Nzau did not identify the shooter after viewing the lineup.

¶ 20       Detective Patrick Deenihan testified that when he arrived to work on September 20, 2003, he learned that Faber, Lenoir and Phillips were all in custody at the station, and that another codefendant, McClellan, was in custody in Waukegan. He also discovered that Lenoir had given a videotaped confession and that Faber had been identified in lineups. Around 1:50 a.m., he and Assistant State's Attorney (ASA) Mary Jo Murtaugh interviewed Faber. She introduced herself as the prosecutor and advised Faber of his rights. He stated that he understood his rights and agreed to speak with her and Detective Deenihan. Faber initially denied shooting Wright, although he admitted to being in the car. Detective Deenihan informed Faber that Lenoir and Phillips had given statements implicating Faber in the crime. Shortly after 7 a.m., Faber was brought into a room to view the videotaped statements. After the viewing, Detective Deenihan advised Faber of his *Miranda* rights and defendant "said

he definitely wanted to talk to" the officers. During the interview, Faber acknowledged that he and Phillips got out of the car and shot Wright.

¶ 21　At around 10 a.m., Faber spoke to ASA Murtaugh and admitted that he shot Wright. At approximately 1p.m., Detective Deenihan spoke with Faber again and Faber admitted that he stood over Wright as he shot him. Faber repeated the information when ASA Murtaugh entered the room. Faber agreed to videotape his statement and signed a consent form. When ASA Murtaugh asked him outside the presence of police how he had been treated, he stated that he had no complaints.

¶ 22　Before giving his statement, Faber was again advised by ASA Murtaugh of his *Miranda* rights and he stated that he understood. Faber stated that a couple of days before the incident, there had been fighting between the Travelers and the Black Disciples. On September 16, 2003, he went to St. Stephen's housing complex and learned that a Black Disciple shot Little Rob, a person he had known for two years. Codefendants Lenoir and Phillips were also present. Phillips said, "F this, F that, ***. We ain't going like that, man." Lenoir said that "we can find some of them and we can whoop some of them." Phillips then grabbed some guns and they all got into Little Rob's car. Lenoir drove and Phillips handed one of the guns to Faber.

¶ 23　As they were driving, they ran into codefendant McClellan and he got into the car. They told McClellan that Little Rob had been shot. He agreed to go with them to look for Black Disciples. Lenoir drove into Black Disciple territory and parked in a lot near the intersection of Madison and Western. Phillips spotted Wright and asked, "Ain't that a BD right there?" and he and Faber got out of the car. Phillips told Faber to bring his gun in case they ran into more Black Disciples. Phillips walked around a van in the street and Faber walked behind the van. Phillips approached Wright with his gun out and asked him if he was a Black Disciple before firing at him. Faber also fired a shot. Faber stated that Wright hit the ground and he walked back approximately three feet before firing another shot at Wright. He stated that he did not know whether his shots hit Wright.

¶ 24　He and Phillips then ran a few blocks before they spotted Lenoir in the car with McClellan. They jumped into the car, and when they got to Oakley and Jackson, Phillips told Faber to give him the gun. Phillips then exited the car and jumped over a fence at St. Stephens. Faber later spoke of the incident to his friend Frank, and Frank advised him that if his shots did not hit Wright, Faber should turn himself in to the police. He told Frank that the shooting was not supposed to happen that way and it "went all out of proportion." Faber stated that he went to court the next morning for another case and he was "snatched out of court."

¶ 25　Faber also stated that he was not threatened or promised anything for giving his statement, and that the police treated him "okay." He was given food to eat, and soda and water to drink. He was also allowed to smoke.

¶ 26　Forensic investigators did not recover any bullets, cartridges or bullet evidence from the scene, nor was a gun ever recovered. A blue 1987 Chevrolet Caprice owned by McClellan was dusted for fingerprints. A lift of fingerprints from the driver's side door interior window matched those of codefendant Lenoir.

¶ 27    Defense counsel did not present evidence in the case. The parties stipulated that if recalled to testify, Nzau would state "that at the time he viewed the lineup at the police station, he tentatively identified Donald Phillips as the person he witnessed fleeing on foot from the scene of the incident." The jury found Faber guilty of first degree murder of Wright and aggravated battery with a firearm of Perez. The trial court sentenced him to 60 years' imprisonment for first degree murder, and 25 years' imprisonment for aggravated battery with a firearm, to be served consecutively. Faber filed this timely appeal.

¶ 28                                              ANALYSIS

¶ 29    Faber first contends the trial court committed reversible error when it prohibited his counsel from questioning Detective Flaherty regarding Nzau's identification of Donald Phillips during the lineup. He argues that section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12 (West 2008)) permits such testimony from a third party even if the declarant did not testify about his or her out-of-court identification. The State argues that this issue is waived because Faber failed to object at trial and include the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The record shows that when the State requested that the trial court prohibit Detective Flaherty from testifying regarding Nzau's identification, defense counsel argued against the position. In his motion for a new trial, Faber alleged that "[t]he trial court erred when [it] sustained objections made by the State to questions asked of witnesses by the defense counsel." It is arguable whether Faber preserved the issue for review; however, even on the merits he does not prevail.

¶ 30    Section 115-12 provides:

        "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testified at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2008).

¶ 31    In *People v. Lewis*, 223 Ill. 2d 393 (2006) our supreme court noted that appellate courts in the past disagreed over the interpretation of this statute. Some had held that section 115-12 requires a declarant to testify about an identification before a third party testifies on the subject, while others had held that such testimony from a declarant is not required before a third party testifies to the identification. *Id.* at 402. In construing the statute, the supreme court reasoned that the plain language of section 115-12 only "requires the declarant to testify and be subject to cross-examination on the identification statement. [Citation.] *** The statute does not expressly require the declarant to testify on the out-of-court identification before a third party may testify about that identification." *Id*. at 402-03. Therefore, it held that a declarant is not required to testify to an out-of-court identification before a third party may testify on the matter. *Id*. at 403.

¶ 32    In the case at bar, Nzau never stated during his testimony that he identified Phillips in the lineup. However, he was present at the trial, he testified under oath, and he was available to be recalled as a witness for cross-examination after Detective Flaherty testified. Therefore, pursuant to section 115-12, Detective Flaherty's testimony regarding Nzau's identification of Phillips during the lineup was admissible and the trial court erred in prohibiting Faber's

counsel from eliciting that testimony. See *People v. Williams*, 383 Ill. App. 3d 596, 636 (2008).

¶ 33     Although the trial court erred, we will not reverse a judgment unless the error caused prejudice to Faber. *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). Faber argues that the identification of the shooter was crucial in the case and Detective Flaherty's testimony supports his position that Phillips, not Faber, shot Wright. Faber's counsel sought to question Detective Flaherty on his report, which read:

> "Innocent Nzau tentatively identified Donald Phillips as a person he witnessed fleeing on foot from the scene of the incident. Mr. Nzau was unable to identify any of the other participants in the line [*sic*] line-up."

However, at trial the parties stipulated that if recalled to testify Nzau would state "that at the time he viewed the lineup at the police station, he tentatively identified Donald Phillips as the person he witnessed fleeing on foot from the scene of the incident." Although Detective Flaherty did not testify on the issue, the same evidence was admitted through the stipulation. Any error in not admitting the identification testimony did not harm Faber since the stipulation enabled him to make his argument that Phillips was the shooter.

¶ 34     Furthermore, as we will subsequently address, the identification of Faber as the shooter was proved by the testimony of Mrs. Christopher and Mr. Stallworth, and their independent identifications of him in the lineup. "Where the trial court improperly excludes identification testimony, the error will be deemed harmless if the identification of the defendant has been proved beyond a reasonable doubt." *People v. Page*, 163 Ill. App. 3d 959, 974 (1987) (citing *People v. Thompson*, 93 Ill. App. 3d 45, 50-51 (1981)). For the reasons set forth, we do not find reversible error here.

¶ 35     Faber next argues that his trial counsel provided ineffective assistance warranting reversal and a new trial. To support a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient so as to fall below an objective standard of reasonableness; and (2) the deficient performance prejudiced him so as to deny him a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Failure to satisfy either the ineffectiveness or the prejudice prong precludes a finding of ineffective assistance of counsel. *People v. Shaw*, 186 Ill. 2d 301, 332 (1998). To demonstrate sufficient prejudice under the second prong, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 36     Faber contends that his trial counsel was ineffective by failing to prepare adequately for his case. Counsel even acknowledged during pretrial proceedings that he was unprepared to represent Faber, stating to the trial court:

> "I have been appointed on this case, and I would like to have a second trial attorney appointed to try it. *** There is too much material, too many case reports, police reports. There are transcripts from other trials. I just think it would be on my part incompetence to do this alone, and I want to bring in another trial attorney."

The trial court responded, "just so the record is clear, I haven't tried a case with you prior to becoming a judge or as a judge, and I have heard you are a very experienced trial attorney."

The court did not appoint another trial attorney and counsel never again brought up the issue. Counsel's admission of ineffectiveness, however, is not binding on a reviewing court or determinative of the issue raised on appeal. *People v. Sanchez*, 169 Ill. 2d 472, 490 (1996). Therefore, we will assess Faber's specific claims to determine whether his counsel provided ineffective assistance.

¶ 37　　First, Faber argues that his counsel was not prepared to present the main theory of his case that codefendant Phillips, not Faber, was the one who shot Wright. Specifically, counsel failed to discover that Detective Flaherty had prepared a report which stated that witness Nzau had identified Phillips in the lineup. Therefore, counsel could not set a proper foundation to allow Detective Flaherty to testify about Nzau's identification. Faber contends that his counsel's failure to investigate was unreasonable and cites as support *People v. House*, 141 Ill. 2d 323 (1990).

¶ 38　　In *House*, the defendant allegedly confessed his involvement in the murders of four people in a statement, but at trial steadfastly testified that he did not give a statement and that he had been handed one written by police who coerced him into signing it. *Id*. at 360-61. One of the victims was treated at a hospital before she died, and there was evidence she described her attackers and the description did not fit that of the defendant. *Id*. at 389. Defendant's counsel, however, mistakenly believed the State would stipulate to certain medical reports and therefore he failed to set the proper foundation to admit the victim's statement. *Id*. at 386-88. Our supreme court found that defendant's counsel's actions were unreasonable, as was his failure to investigate nurses whose testimony could have established a foundation to admit the victim's statements. *Id.* The court also found that the defendant was prejudiced by the error since "the only substantial evidence against defendant was his alleged oral confession which he immediately repudiated." *Id.* at 389. Therefore, although the evidence presented was sufficient to find defendant guilty beyond a reasonable doubt, the results may have been different had the excluded evidence been admitted. *Id.*

¶ 39　　Although Faber's trial counsel failed to question Nzau about his identification contained in Detective Flaherty's report, as we discussed above it was the trial court that erred in prohibiting Flaherty's testimony about the identification. Furthermore, we do not see how Faber was prejudiced by counsel's conduct. Unlike the case in *House*, there was other substantial evidence against Faber at trial. Testimony from other witnesses implicated Faber as the shooter. The parties also stipulated that if recalled to testify, Nzau would state "that at the time he viewed the lineup at the police station, he tentatively identified Donald Phillips as the person he witnessed fleeing on foot from the scene of the incident." This language is essentially the same as that contained in Detective Flaherty's report and provides support for Faber's argument that Phillips shot Wright. His counsel did in fact rely on the stipulation during closing argument. Since counsel's conduct did not prejudice him, Faber cannot prevail on this ineffective assistance claim.

¶ 40　　Faber also contends his trial counsel was ineffective for promising in his opening statement that Phillips would take the stand. Phillips, however, did not testify and Faber argues it was unreasonable for counsel to make a promise to the jury that he could not fulfill. It may be ineffective assistance when counsel promises that a particular witness will testify but does not provide the promised testimony at trial. *People v. Ligon*, 365 Ill. App. 3d 109,

120 (2006). However, "counsel's failure to provide promised testimony is not ineffective assistance *per se*." *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002).

¶ 41 The State acknowledges that prior to trial, it did intend to call Phillips as a witness and tendered to defense counsel Phillips' proffer, plea agreement, amended plea agreement, and criminal history in preparation. In its opening statement, the State informed the jury that Faber was one of four codefendants in the case. It stated, "[h]e sits alone today, and you are only to consider him, but you will hear about his partners in crime. You will hear about how they were all arrested and also charged in this murder." In response, Faber's counsel in his opening remarks stated:

"I ask that you be patient, *** I ask that you specifically listen to the testimony of one of the theys that [the State] referred to. And that they is Donald Phillips.

Donald Phillips will get on this witness stand, and Donald Phillips will tell you that he cut a deal with the State's Attorney's Office, and that deal is to testify against Earl Faber. And that deal saves him from spending the rest of his life in the penitentiary. And with that testimony, they are hoping that you decide Earl Faber is guilty."

¶ 42 During the course of the trial, however, the State decided not to call Phillips. When defense counsel made his opening remarks to the jury, he reasonably believed that the State would call Phillips to testify. Counsel's opening remarks are not error if there is no indication he knew at the time he made the remarks that the promised witness would not testify. See *People v. Patterson*, 347 Ill. App. 3d 1044, 1052 (2004).

¶ 43 *People v. Bryant*, 391 Ill. App. 3d 228 (2009), relied on by Faber as support, is inapposite. In *Bryant*, defense counsel in his opening remarks stated that " '[m]y clients will testify in this trial, make no bones about it. We know you want to hear it from their mouths.' " *Id.* at 230. Defense counsel then proceeded to inform the jury what their testimony would purportedly establish. *Id.* At the trial, however, defense counsel rested after the State's case and presented no evidence. *Id.* at 235. He erroneously "believed that he did not need to support his arguments with evidence." *Id.* at 241. Furthermore, the State's case depended on the questionable testimony of an "admitted addict" and an "uncharged accomplice" whose testimony defense counsel successfully impeached. *Id.* at 242. The *Bryant* court found that given that the evidence against the defendant was not overwhelming and that defense counsel presented no evidence leaving the theory of his case wholly unsupported, the defendant was prejudiced by his counsel's actions. *Id.* at 243.

¶ 44 In contrast to *Bryant*, no error occurred here. Even if Faber's counsel committed error, he was not prejudiced by any misconduct. Two witnesses provided reliable testimony identifying Faber as the shooter. Faber gave a statement detailing his involvement in the shooting. Also, the parties entered into a stipulation which supported Faber's theory of the case that Phillips was the shooter. The record shows that Faber's counsel ably advocated on behalf of his client. He filed motions to suppress identification and vehemently argued the motions on behalf of Faber. At trial he argued that Faber was coerced into making his statement, cross-examined the State's witnesses and questioned the reliability of the witnesses' identification of Faber as the person who shot Wright, pointed out the lack of physical evidence linking Faber to the crime, and focused on Nzau's identification of Phillips

-10-

as the person he saw fleeing from the crime scene. A defendant is entitled to competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Faber's counsel did not provide ineffective assistance.

¶ 45    Faber next contends that the State violated section 107A-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107A-5 (West 2008)) when it lost the photographs used in the arrays shown to Mrs. Christopher and Mr. Stallworth, therefore making the arrays "unavailable to the defense for even a cursory review." He argues that without the arrays, one cannot know what suggestive inferences may have been in the photos and which may have contributed to subsequent identifications. He further argues that the trial court should have suppressed any testimony concerning the photo array identifications at trial as a remedy.

¶ 46    The record shows that this issue arose during a hearing on Faber's motion to suppress identification testimony. Defense counsel stated that he did not possess a copy of the photo arrays shown to the witnesses. He "believe[d] he [had] seen [the] photo array and the lineup in previous hearings," but he never had a copy of the materials. The State responded that it did not have a copy of the photo array at the hearing because the allegations in the motion never mentioned a photo array. Furthermore, the State claimed it had tendered the arrays to defense counsel and possessed discovery receipts for the arrays. Defense counsel, however, insisted he never possessed the arrays. The trial court had "no doubt" that "the State complied fully with discovery." However, it continued the cause to allow the State to tender a copy of the arrays to defense counsel and allow defense counsel to amend his motion. At the next hearing, the State acknowledged that the arrays were lost. They had been last seen during the trial of Faber's co-defendant Lenoir. The photos were checked out of evidence during the trial but never used, and now the State could not track them down.

¶ 47    Section 107A-5 of the Code was enacted as part of the legislature's reform to the capital punishment system in Illinois. It provides:

> "(a) All lineups shall be photographed or otherwise recorded. These photographs shall be disclosed to the accused and his or her defense counsel during discovery proceedings as provided in Illinois Supreme Court Rules. All photographs of suspects shown to an eyewitness during the photo spread shall be disclosed to the accused and his or her defense counsel during discovery proceedings as provided in the Illinois Supreme Court Rules." 725 ILCS 5/107A-5(a) (West 2008).

It is undisputed that defense counsel requested the photo arrays during the hearing, and the State failed to tender a copy of the arrays because they had been lost. The State's failure to disclose the arrays when requested by defense counsel is clearly a violation of section 107A-5. The issue of first impression before us is whether the State's violation of the statute requires suppression of any identification testimony concerning the photo arrays as a remedy. In order to make this determination, we must ascertain whether section 107A-5 is mandatory or directory which is a question of statutory construction. A statute's language most reliably reflects the legislature's intent. *Pullen v. Mulligan*, 138 Ill. 2d 21, 46 (1990). The construction of a statute is reviewed *de novo*. *People v. Delvillar*, 235 Ill. 2d 507, 517 (2009).

¶ 48    The mandatory/directory distinction " 'simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental

action to which the procedural requirement relates.' [Citation.]" (Internal quotation marks omitted.) *Delvillar*, 235 Ill. 2d at 516. In making this determination, a presumption exists that "language issuing a procedural command *** indicates an intent that the statute is directory" rather than mandatory. *Id.* at 517. This presumption is overcome by showing either language prohibiting further action in the case of noncompliance or that the right protected by the provision would generally be harmed under a directory reading. *People v. Robinson*, 217 Ill. 2d 43, 58 (2005).

¶ 49    With regard to the first factor, section 107A-5 does not contain language prohibiting the admission of identification testimony as a remedy for the State's noncompliance. With regard to the second factor, section 107A-5 protects defendant's right to a fair trial. However, admission of a suggestive photo array is reversible error only if the suggestiveness of the photos prejudiced defendant. See *People v. Johnson*, 149 Ill. 2d 118, 147-48 (1992). In cases such as the one before us, where Faber had given a statement confessing to his being the shooter and two witnesses separately identified him as the shooter under reliable circumstances, any suggestiveness of the photos was minimal and his right to a fair trial is not harmed by a directory reading of the statute. Accordingly, the presumption in favor of a directory reading of section 107A-5 applies in this case. However, we find the failure of the State to disclose the photo arrays to Faber's counsel as requested very disturbing. We do not hold that there can never be consequences to the State's noncompliance with the statute. "A directory reading acknowledges only that no specific consequence is triggered by the failure to comply with the statute." *Delvillar*, 235 Ill. 2d at 515. We caution that in a case where the evidence is closely balanced, it may be that the correct remedy is to suppress the identification testimony.

¶ 50    Faber also argues that the trial court should have granted his motion to suppress testimony concerning the lost photo arrays, and to suppress his lineup identification under common law. In reviewing the trial court's denial of a motion to suppress, we accord great deference to the court's findings of fact and will reverse only if those findings are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, the ultimate question of whether the trial court erred in denying the motion to suppress is reviewed *de novo. Id.*

¶ 51    Faber contends that the trial court improperly denied his motion to suppress the photo array identification testimony where the State lost the arrays. Therefore, he asks this court to reverse his conviction and remand for a new trial. Although the State lost the arrays, the absence of the photographs alone is not enough to reverse Faber's conviction. *People v. Meredith*, 37 Ill. App. 3d 895, 899 (1976). " '[U]nless a criminal defendant can show bad faith *** failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *People v. Harris*, 182 Ill. 2d 114, 147 (1998) (quoting *Arizona v. Youngblood*, 488 U.S. 51 (1988)). Where the loss is inadvertent, and there is no indication that the evidence was treated differently than evidence in any other case, the loss of the photographs in itself does not constitute a denial of due process. *Harris*, 182 Ill. 2d at 147. Instead, the relevant question is whether, considering the totality of the circumstances, "the [photographic] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Meredith*, 37 Ill. App. 3d at

899 (citing *People v. Williams*, 60 Ill. 2d 1 (1975)).

¶ 52    In *People v. Purnell*, 129 Ill. App. 3d 253, 261 (1984), the defendant argued that he " 'was denied a fair trial where the trial court admitted evidence of [his] identification from a photograph array where the prosecutor failed to produce the photographs [and the] error prevented defendant from establishing that the photographic procedure was unduly suggestive and rendered [the] identification testimony unreliable.' " The court found that the failure to provide the photographs was inadvertent, and that once the State discovered the evidence was missing, it diligently attempted to find the photographs. Furthermore, the witness testified that the photographs were of different men, no one told her which photograph to select, and after viewing them she again selected defendant from a lineup conducted shortly thereafter. The court held that the pretrial photo identification procedure was not impermissible or suggestive. *Id.* at 261-62.

¶ 53    As discussed above, the trial court found that the State's loss of the photo arrays was inadvertent and it diligently attempted to track down the arrays once they were discovered missing. Detective Flaherty described the photos as head and shoulder shots, approximately the size of a piece of 8 x 11 inch paper. The photos of other subjects were obtained from Chicago Police computer records. Detective Flaherty testified that he photos were closely matched by gender, race, age, and facial features. No one told the witnesses which photo to select, or that the offender's photo was in the array. Like *Purnell*, the trial court's finding that the photo array procedure was proper was not against the manifest weight of the evidence.

¶ 54    Although there was some conflicting testimony about when the arrays were shown to the witnesses, and whether the array contained separate photos or all the photos were displayed on a single page, such minor inconsistencies affect only the weight to be given the testimony. *People v. Green*, 298 Ill. App. 3d 1054, 1064 (1998). It is within the province of the fact finder to determine the credibility of witnesses and the weight to be given their testimony by resolving any conflicts in the testimony. *People v. Jones*, 295 Ill. App. 3d 444, 452 (1998). A reviewing court will not substitute its judgment on these issues for that of the factfinder. *Id.*

¶ 55    Faber also argues that the trial court should have granted his motion to suppress the lineup identifications. He contends the lineup was unduly suggestive because he was the only person shown in both the photo array and the lineup. He was also the only person in the lineup wearing the clothes witnesses described the offender as wearing, and his muscular physique made him stand out from the others. Pretrial identifications of a defendant are excluded only if the identification procedure was unnecessarily suggestive leading to a substantial likelihood of misidentification. *People v. Hartzol*, 222 Ill. App. 3d 631, 642 (1991). Defendant bears the burden of showing that a pretrial confrontation was unduly suggestive. *Id.*

¶ 56    Faber argues the lineup was suggestive because he was the only one in the lineup who was also in a photo array previously shown to the witnesses. However, the mere fact Faber was the only person in both the array and the lineup does not render the lineup suggestive. *People v. Johnson*, 149 Ill. 2d 118, 148 (1992); *Hartzol*, 222 Ill. App. 3d at 643. Furthermore, any error is "harmless where the photo array was not essential to the lineup

identification, or the in court identification of defendant." *Id*. at 644. In addition to their lineup identification of Faber, Mrs. Christopher and Mr. Stallworth also testified about their encounter with the shooter and identified Faber in court as the offender. There is no indication in the record that their in-court identification of Faber was influenced by the photo array.

¶ 57　　Faber further contends the lineup was suggestive because he was the only person wearing a sleeveless T-shirt when Mrs. Christopher described the offender as wearing a "Dago-T," and his physique made him stand out from the other participants. The law does not require that participants in a lineup be identical or near identical. *People v. Johnson*, 222 Ill. App. 3d 1, 8 (1991); *People v. Gabriel*, 398 Ill. App. 3d 332, 348 (2010). A photograph of the lineup shows that Faber wore a sleeveless white T-shirt, three others wore short-sleeved white T-shirts and two others wore colored shirts. The fact that Faber was the only person wearing a sleeveless T-shirt a witness described the offender as wearing is not sufficient to render the lineup suggestive. See *People v. Johnson*, 222 Ill. App. 3d 1, 8 (1991) (lineup was not suggestive even though defendant was the only participant wearing red trousers when witnesses described the offender as wearing red trousers). Detective Flaherty, whom the trial court found to be a credible witness, stated that Faber merely wore his civilian clothes in the lineup. Without more to indicate that the police through its activities "spotlighted" Faber in the lineup, there is "no improper influence here where the defendant simply wore his own clothing in the lineup." *Gabriel*, 398 Ill. App. 3d at 349. Although Faber has a muscular physique, he was not markedly more muscular than the others. The participants appear to be of similar age and weight, and Faber was asked to select his position in the lineup. We do not find the lineup unduly suggestive.

¶ 58　　Lastly, the totality of the circumstances show that the identification testimony was reliable. *Gabriel*, 398 Ill. App. 3d at 348. Factors to consider when determining the reliability of an identification include (1) the opportunity of witnesses to view the offender; (2) their degree of attention; (3) the accuracy of their description of the offender; (4) their level of certainty shown at the time of identification; and (5) the length of time between the crime and the identification. *People v. Barnes*, 364 Ill. App. 3d 888, 893 (2006). Mrs. Christopher and Mr. Stallworth had ample opportunity to view the offender in daylight, and their degree of attention was high. The witnesses viewed the lineup only three days after the shooting occurred and at no time were they told that the shooter was in the lineup. We note that aside from their lineup identification of Faber, Mrs. Christopher and Mr. Stallworth also identified Faber in court during the trial.

¶ 59　　For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 60　　Affirmed.

-14-