2022 IL App (1st) 200018-U

FIRST DISTRICT,
FIRST DIVISION
February 7, 2022

No. 1-20-0018

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 12 CR 19303 |
| THOMAS DOMINGUEZ, | ) ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) ) | Alfredo Maldonado, Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Summary dismissal of defendant's *pro se* postconviction petition alleging ineffective assistance of appellate counsel for failing to raise an issue on appeal affirmed where the underlying issue lacked arguable merit.

¶ 2    Following a bench trial, defendant Thomas Dominguez was convicted of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) and was sentenced to 38 years' imprisonment. Defendant filed a *pro se* postconviction petition, alleging that appellate counsel was ineffective

for failing to argue that the trial court erred in denying his motion to suppress identification. The trial court summarily dismissed the petition as frivolous and patently without merit. We affirm.

¶ 3                                                  BACKGROUND

¶ 4                                        Motion to Suppress Identification

¶ 5        Defendant was charged with attempted murder and aggravated battery for the shooting of Felix Rosado. Felix's brother, Elberto Rosado,[1] identified defendant as the shooter in a photo array, and both Felix and Elberto identified defendant in a physical lineup.

¶ 6        Prior to trial, defendant filed a motion to suppress Felix and Elberto's identifications, arguing that the identification procedures were "unnecessarily suggestive." At a hearing on the motion, the court viewed a copy of the photo array and photos of the physical lineup.[2] Defense counsel argued that the photo array was unduly suggestive because Elberto described the shooter as having a horn tattoo above his eye and defendant was the "only one with tattoos of horns on his face" and "[t]he other gentlemen *** while they do have tattoos on their face they are not of the nature described by the witness ***." Additionally, one filler had much longer hair than defendant. In the physical lineup, defendant was the "only person *** that has a similar tattoo" and there was another gentleman with "long hair that seem[ed] to be bunched up," which did not match the description of the offender.

¶ 7        The trial court denied defendant's motion to suppress, finding that neither the photo array nor the physical lineup were "overly suggestive." Specifically, the court found that it is "really, really tough to pick up any tattoos on his face" in the photo array and "[s]everal of the other people have much more distinctive tattoos than he has." And except for one individual with long

---

[1] We will refer to Felix and Elberto Rosado by their first names.
[2] The photos were displayed on a video screen so the trial court could view "larger versions" of them.

hair, "[t]he other four individuals *** in the photo array are a fair representative." For the physical lineup, the court noted that the "ability to observe the tattoos on the Defendant's face are extremely difficult in both blowups *** and the actual physical documents ***. All four individuals are seated so the height is not a problem. The hair on the three *** other people besides the Defendant is fairly representative of the issue."

¶ 8                                        Bench Trial

¶ 9         On July 6, 2012, Felix drove from his home in Detroit, Michigan to Chicago for a family reunion. Around 11:30 p.m. or 12:00 a.m., he went to a bar with his brothers Elberto and Alfredo Rosado and his brother-in-law, Jose. Felix had "one shot and probably two beers," but was not impaired. About 45 minutes to an hour later, two young men ran into the bar and said "some Maniac Latin Disciples were chasing them outside with guns." Felix, a former member of the Spanish Cobras, was "not into that kind of stuff" anymore and told Elberto that he wanted to leave.

¶ 10        Outside, Felix saw the defendant "standing there" with a gun from about 10 to 15 feet away. Defendant approached Felix and Elberto, stopping "about a foot right in front of [them]." Felix "kept his eyes on him," observing defendant's size, weight, and face.

¶ 11        Elberto asked defendant who he was, and defendant said he was a "Maniac." Defendant asked Felix "what about you? What do you be about?" Felix raised his hands and responded, "I'm from Detroit, Michigan. I don't know s***." Defendant pointed his gun at Felix and said, "there's Cobras in Detroit." Felix was "looking at his face" and thought defendant was going to kill him, so he rushed him and tried to grab the gun.

¶ 12        As Felix fought with defendant over the gun, defendant shot him in the shoulder. Felix grabbed defendant "with all of [his] might and threw him to the side and *** started running ***

toward [his] vehicle." He heard gunshots from behind him, felt his pants "jump," and realized he had been shot again in the back. Alfredo drove him to a nearby hospital, but he was transferred to a "trauma hospital" for treatment due to the severity of his injuries. The doctors were unable to remove the bullet lodged in his back, where he "feel[s] it every day."

¶ 13        Elberto testified that when he and Felix left the bar, a "younger guy" known to him as "Booty" greeted them. Defendant showed up a few seconds later, "walk[ing] right in front of [his] face" asking Elberto and Booty if they were Cobras. From "less than a foot" away, he saw that defendant had a gun in his hand, pointed at the ground. It was "pretty light" outside of the bar and Elberto had an unobstructed view of defendant.

¶ 14        When defendant turned toward Felix, Elberto noticed a horn tattoo above his eyebrow and a tattoo on his neck. Elberto did not know defendant prior to the shooting. He acknowledged he was a "retired" member of the Spanish Cobras and that Booty told him that someone named "Mikey" shot Felix. At the hospital, Elberto told the police that the shooter was Hispanic, about his height, and had a tattoo on his neck and a horn tattoo above his eye.

¶ 15        Defendant's sister, Yesenia Teliz, testified that she was with defendant, her mother, her children, and a couple of friends at a backyard barbecue when gunshots rang out around 1:00 or 2:00 a.m. on July 7, 2012. Defendant grabbed the kids and they stayed inside for the rest of the night. Defendant was not with her "every single minute" in the backyard.

¶ 16        Prior to identifying defendant in a photo array on August 5, 2012, Elberto signed an advisory form indicating that he understood the suspect may or may not be in the lineup, that he was not required to make an identification, and that he did not assume the person administering the lineup knew which person was the suspect. On September 13, 2012, Felix and Elberto met with Chicago police officers to view a physical lineup. Both men signed advisory forms identical

to the form Elberto had previously signed. As soon as Felix saw the lineup, "[he] knew it was him" and instantly identified defendant as the shooter. Regarding his level of certainty, Felix stated, "I can't forget his face," "that's him *** no doubt." Elberto also identified defendant as "the one that had the gun. He's the one that shot [Felix]."

¶ 17        Defendant was found guilty of attempted first degree murder and aggravated battery with a firearm and sentenced to 38 years' imprisonment. His conviction was affirmed on direct appeal. *People v. Dominguez*, 2019 IL App (1st) 153214-U, ¶ 2.

¶ 18        On August 7, 2019, defendant filed a *pro se* petition for postconviction relief, alleging ineffective assistance of appellate counsel.[3] Defendant claims that appellate counsel "confirmed *** that the trial court did in fact err[] in denying petitioner's pretrial motion to suppress, and assured [him] that this would definitely be one of the issues presented in [his] appellate brief."

¶ 19        The circuit court summarily dismissed the petition, finding that the "there is not an arguably reasonable probability that [defendant's] appeal would have been successful" had appellate counsel raised this issue. Specifically, the "motion to suppress the identifications relied solely on one distinct feature—his horn tattoo near his eye," which the trial court found to be "hardly noticeable" in the photo array and the lineup. Further, the record did not show that the other participants, save one with a different hairstyle in each procedure, were not substantially similar in appearance. The court also concluded that Felix and Elberto's identifications were based on their independent recollections because they had "ample opportunity to observe the shooter who spoke to them in close proximity before the incident turned violent."

--------------

[3] The denial of the motion to suppress was raised in defendant's motion for new trial, and denied by the trial court.

¶ 20                                    ANALYSIS

¶ 21          The Post-conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*) (West 2018) allows

criminal defendants to challenge their convictions based on constitutional violations. *People v.*

*Domagala*, 2013 IL 113688, ¶ 32. A petition is summarily dismissed at the first stage of

postconviction proceedings if it is "frivolous or is patently without merit" (725 ILCS 5/122-

2.1(a)(2) (West 2018)), meaning it "has no arguable basis either in law or in fact." *People v.*

*Hodges*, 234 Ill. 2d 1, 11 (2009). A *pro se* petitioner need only set out a "gist" of a constitutional

violation by "alleg[ing] enough facts to make out a claim that is arguably constitutional for

purposes of invoking the act." *Id.* at 9. We review the first stage dismissal of a postconviction

petition *de novo*. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 22          The "same standard" set out in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to

claims of ineffective assistance of appellate counsel. *People v. Childress*, 191 Ill. 2d 168, 175

(2000). Defendant must show that appellate counsel's performance was objectively unreasonable

and that "but for appellate counsel's errors, the appeal would have been successful." *People v.*

*Golden*, 229 Ill. 2d 277, 283 (2008). Because defendant's petition was dismissed at the first

stage, he must show that "it is arguable that counsel's performance fell below an objective

standard of reasonableness" and "it is arguable that [he] was prejudiced." (Emphasis omitted.)

*People v. Tate*, 2012 IL 112214, ¶ 19; see also *People v. Shief*, 2016 IL App (1st) 141022, ¶ 56

(applying this standard to ineffective assistance of appellate counsel claim).

¶ 23          Appellate counsel is not required to raise every conceivable issue on appeal, and it is not

incompetence if counsel fails to raise an issue which, in his or her judgment, is without merit,

"unless counsel's appraisal of the merits is patently wrong." *People v. Scott*, 2011 IL App (1st)

100122, ¶ 28. Since "a defendant does not suffer prejudice from appellate counsel's failure to

raise a nonmeritorious claim on appeal" (*id.*), the prejudice inquiry requires the reviewing court to examine the merits of the underlying issue. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 24    When challenging the admissibility of an identification, the defendant bears the burden of showing that it was "so unnecessarily suggestive and conducive to irreparable misidentification" as to deny him due process of law. *People v. Jones*, 2017 IL App (1st) 143766, ¶ 28. If defendant makes such a showing, the State must demonstrate that "under the totality of the circumstances, the identification *** is nonetheless reliable." *People v. Moore*, 266 Ill. App. 3d 791, 797 (1994). The State does this through "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999).

¶ 25    Defendant argues that the photo array was unduly suggestive because "only [defendant] ha[s] a horn tattoo over his eye," the fillers' facial tattoos are "unmissable," two fillers have "noticeably slighter builds," and two have "noticeably different hairstyles."

¶ 26    It is well established that participants in a lineup or photo array are not required to be identical or near identical. *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57. As the trial court noted, it is very difficult to see any tattoo on defendant's face in the photo array. The fillers are all Hispanic males with skin tones, builds (except for one with a slightly smaller build), and facial hair similar to that of the defendant. While one filler has much longer hair than the others, " '[i]t is a truism that individual facial features and hair styles and lengths differ, and this makes precise correspondence of all subjects in a photo array a practical impossibility.' " *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 41 (quoting *People v. Harrell*, 104 Ill. App. 3d 138, 145 (1982)); see also *People v. Torres*, 2021 IL App (1st) 182125-U (while two fillers had long ponytails, "since the other three lineup participants were viable choices for identification, the

lineup was not unduly suggestive as to violate defendant's due process rights"). Moreover, these differences generally go to the weight of the evidence and not necessarily its admissibility. *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 29.

¶ 27      Defendant also argues that the lineup was unduly suggestive because defendant "was the only participant with any sort of marking over his eye," none of the other participants had facial tattoos, and three out of the five were "much smaller" than defendant. However, the photographs of the physical lineup support the trial court's finding that defendant's facial tattoos are "extremely difficult" to see in the enlarged photos. All of the lineup participants are Hispanic males with similar builds and skin tones. But for one (notably not the defendant), they each had short hair. Since there is no evidence that the photo array or the physical lineup were unduly suggestive, defendant was not prejudiced by counsel's failure to raise this issue on appeal. Compare *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (2010) (lineup not suggestive where defendant was the only one wearing a white t-shirt, but the four other men were of the same approximate age and skin tone and shared "many similar features") with *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 62 (finding lineup unduly suggestive where defendant was the only participant "with three particular articles of clothing, a unique hairstyle, and facial feature matching the description of the offender").

¶ 28      Relying on *People v. Gonzalez*, 2018 IL App (1st) 152242, defendant further asserts that Felix was told prior to viewing the lineup that a suspect was in custody and defendant "was the only individual in both the photo array and the lineup." In *Gonzalez*, we found that the identification procedures "may have undermined the reliability of the identification by the victim" where both eyewitnesses testified that "the police told them (1) that the police found the shooter and (2) *his photo was in the photo array*." (Emphasis added) *Id.* ¶¶ 95, 97. This error by

the police was "compounded" where the defendant was "the only person to appear in both the photo array and the subsequent lineup." *Id.* ¶ 96.

¶ 29    In contrast, although Felix was told that the police had a suspect in custody, he and Elberto both signed lineup advisory forms indicating that they were aware that the suspect may or may not be in the lineup and Felix did not view the photo array. "Lineups are not rendered inadequate *** merely because the defendant is the only individual in the lineup who was also in the photographs. [Citation.] Some element of suggestiveness *** must be shown." *People v. Johnson*, 149 Ill. 2d 118, 148 (1992); see also *People v. Ortiz*, 2017 IL App (1st) 142559, ¶¶ 25-26 (identification not unduly suggestive even where witness "signed a lineup advisory form that informed him the police did have a suspect in custody but the suspect may or may not be in the lineup [the witness] was about to view").

¶ 30    Finally, even if appellate counsel had challenged the trial court's denial of defendant's motion to suppress the pre-trial identifications, the record contains sufficient evidence that Felix and Elberto identified defendant at trial based on their own independent recollections, which overcomes any showing of suggestiveness. See *People v. Enis*, 163 Ill. 2d 367, 398-99 (finding "sufficient circumstances to conclude that the identification testimony provided by [the witnesses] was independently reliable" even where the trial court found the identification procedures "improper and suggestive"). Therefore, it is not reasonably arguable that defendant's appeal would have been successful if the denial of his motion to suppress had been raised.

¶ 31    In determining whether an identification has an independent basis, we consider:

"(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty demonstrated by the witness at the suggestive

confrontation; and (5) the length of time between the offense and the suggestive confrontation." *Brooks*, 187 Ill. 2d at 129; see also *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) (known as the "*Biggers* factors").

We also consider whether the witness "was acquainted with the suspect" before the crime and "whether there was any pressure on the witness to make a certain identification." *Brooks*, 187 Ill. 2d. at 130.

¶ 32    In this case, both men had an unobstructed view of the shooter from only a foot or two away on a well-lit street and were able to carefully observe the shooter during the encounter (i.e., Felix "kept [his] eyes on [defendant]" after initially seeing him with the gun and Elberto was close enough to observe defendant's unique facial characteristics). In addition, Elberto gave the police a detailed description of the offender shortly after the shooting that was consistent with defendant's appearance (i.e., that he was a Hispanic male with a horn tattoo above his eye and a tattoo on his neck).

¶ 33    Felix testified that "as soon as" he saw defendant in the lineup, he had "[n]o doubt" that defendant was the shooter. Elberto similarly testified that defendant "was right in [his] face *** He's the one that had the gun. He's the one that shot [Felix]." While defendant argues that there is "little correlation between a witness's self-report of certainty and identification accuracy," this "does not necessarily mean that a witness's confidence should play *no* role in our analysis." (Emphasis in original.) *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 96. Where, as here, the witnesses were certain in their identifications and no expert testimony or other evidence suggests that certainty should be disregarded, this factor weighs in favor of reliability. *Id.*

¶ 34    As to the time that elapsed between the crime and the identifications, "reviewing courts have found identifications reliable where nearly three months or more elapsed between the crime

and the witness's identification." *People v. Green*, 2017 IL App (1st) 152513, ¶ 113; see also *People v. Corral*, 2019 IL App (1st) 171501, ¶ 81 (photo array identification 48 days after the offense and lineup identification 14 days thereafter weighed in favor of the State); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification made one year and four months after the crime was reliable). Elberto and Felix's identifications in this case fall well within these parameters. Since there is no evidence that Felix and Elberto were pressured to identify the defendant, the only factor weighing in favor of suppression is the fact that Felix and Elberto did not know defendant prior to the shooting.

¶ 35        Under the totality of these circumstances, the victims had an independent basis for identifying the defendant and defendant was not prejudiced by counsel's failure to raise the denial of his motion to suppress on direct appeal. See, *e.g.*, *Joiner*, 2018 IL App (1st) 150343, ¶ 54 (where "the victims had an independent basis for making their identifications, defendant was not prejudiced by trial counsel's failure to move to suppress the photo array identification").

¶ 36                                CONCLUSION

¶ 37        For the foregoing reasons, we affirm the circuit court's summary dismissal of defendant's postconviction petition.

¶ 38        Affirmed.