2021 IL App (1st) 181344-U

SIXTH DIVISION
December 10, 2021

No. 1-18-1344

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 17967 |
| | ) | |
| | ) | |
| | ) | |
| LAMAR KENNEDY, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
JUSTICES HARRIS and JOHNSON concurred in the judgment.

## ORDER

¶ 1    *Held*:   The lineup was not suggestive.  Defendant was not denied his right to confront witnesses.  He received effective assistance of counsel.  He was not denied a fair trial. His sentence was not excessive and does not violate his constitutional rights.

¶ 2    Defendant, Lamar Kennedy, was charged with multiple counts of first degree murder, including personally discharging a firearm that caused death. He was convicted as charged and sentenced to 25 years' imprisonment for the first degree murder conviction, with a 25-year mandatory firearm enhancement. Defendant now appeals and argues: 1) he was denied a fair trial

when the court erred in denying his motion to suppress an identification as it was unduly suggestive, and trial counsel provided ineffective assistance in failing to renew the motion; 2) he was denied his right to confront the witnesses against him where the judge barred any inquiry into an identity theft charge that had been brought against a witness and subsequently dismissed; 3) he was denied a fair trial where the trial court denied his motion to excuse a juror for cause because he did not understand English and had difficulty understanding *Zehr* principles; 4) he received ineffective assistance of counsel; 5) his sentence is excessive and violates the eight amendment and the proportionate penalties clause. For the following reasons, we affirm the judgment and sentence of the trial court.

¶ 3                                    BACKGROUND

¶ 4      Prior to trial, defendant filed a motion to suppress identification alleging that the line-up viewed by witness, Veronica Hill, was impermissibly suggestive due to the "disparity in hairstyles" represented, and because defendant was the only one wearing a yellow shirt. The trial court denied the motion.

¶ 5      Veronica Hill testified that in June of 2016, she lived in the Chicagoland area, but, by the time of trial, had since moved to Cincinnati, Ohio. On June 4, 2016, Hill was dating Kori Sellers and had been for three years. At about 5 p.m. that night, she was driving him to work. On the way, they stopped at a Walgreen's, and then went to the gas station across the street. At the gas station, Sellers got out of the car and went inside the store. While Hill waited in the car, a man standing in front of the store asked her if she was "waiting on [her] boyfriend," and she indicated she was. Sellers returned to the car about five minutes later and got back into the front passenger seat. As Hill began to pull out of the gas station, she heard shots and "hit the brake." Her driver's

side window was down and someone, whom she later identified as defendant, stuck his hand inside her car with a gun and fired five shots into Sellers. Defendant then ran "[t]owards the street. Towards Walgreens."

¶ 6    After the shooting stopped, Hill "hit the gas and drove to the hospital." She was pulled over pulled over by the police who ended up escorting her there. After Sellers was taken out of her car, Hill took the shell casing she found in her backseat and gave it to the police.

¶ 7    Police came to Hill's house at about 4:00 a.m. on June 5, 2016. She had just gotten home from the hospital. The police showed her a photo array and she did not identify anyone, explaining she was "half asleep," and needed to see a physical line-up. On June 14, 2016, she went to the police station and viewed another photo array.   She did not identify anyone from that photo array either. On November 3, 2016, at 1:35 a.m., she went to the police station and viewed a live line-up. There, she identified defendant as the shooter.

¶ 8    A video from the gas station on the night of the shotting was published to the jury. Hill identified herself  in the video. The video showed Hill drive into the gas station and pull up in front of the store. It then showed Sellers get out of the car, walk around the car and speak to Hill and then approach the store.   Another camera angle showed a bus stop at the corner across the street, and a man wearing a v-neck white t-shirt get off the bus, walk across the street to the gas station and approach the store.

¶ 9    From the camera inside the store, Sellers can be seen entering and going off camera, coming back in view, standing in line to pay, looking at merchandise at the counter, standing in line again, paying, and leaving. Other customers are seen throughout this video, including a man who enters the store wearing a white crew neck t-shirt and camouflage pants. Another clip shows

Sellers getting back in the passenger seat of Hill's car, and Hill driving off. The next clip shows Hill's car pulling away, and then shows the man who got off the bus in the v-neck white t-shirt running alongside her car, sticking his arm inside, taking his arm out, turning and running through the parking lot. The final clip shows the same man running through the parking lot to the sidewalk and then to the right.

¶ 10    On cross-examination, Hill admitted that she was on supervision for retail theft. Hill further acknowledged that she had suggested to the police that "Meechie Gaddis," could have been the person standing outside the gas station store. Also, she described the shooter to police as being 5'6", 150 pounds, and being dark complected. She also testified that she did not remember telling Detective Cavazos that she didn't answer the person who asked about her waiting on her boyfriend at the gas station. She denied telling Detective Cavazos that the person had been smoking a cigarette, and that when Sellers came out of the store, the person asked her, "is that your boyfriend."

¶ 11    Chicago Police Intelligence Officer Eric White testified that on June 4, 2016, Officers Romero and Escobedo from the gang investigations division texted him inquiring if he knew a person by the name of "Meechie." He knew "Meechie," and that Meechie's real name was Demetrius Gaddis. The officers texted Officer White a picture of whom they believed to be "Meechie," but Officer White immediately recognized the person in the photo to be "Lamar Kennedy," defendant, whom he knew "well." Defendant had been a confidential informant for Officer White for approximately 2 years. Officer White informed the officers that the person in the picture was defendant, not "Meechie."

¶ 12    Footage from the CTA bus was also published to the jury. The man in the v-neck white t-

shirt can be seen waiting on the sidewalk for the bus, the bus pulling up, boarding the bus, paying, and choosing a seat behind the bus driver. At 5:55, the man got off the bus, and walked to the corner. After waiting for the traffic to stop, the man began crossing the street.

¶ 13    Officer White identified the person in the CTA video as defendant. Officer White also identified defendant on the gas station video footage as the person in the white shirt, blue jeans, and black shoes running away from the Hill's vehicle. Officer White did not see defendant in the footage from inside the gas station store.

¶ 14    Chicago Police Detective Abdalla Abuzanat testified that he was the evidence technician on the case. He went to St. Bernard Hospital where he photographed and fingerprinted the victim and then processed Hill's grey 1999 Nissan Maxima. A fired bullet was recovered from the floorboard of the driver's seat and a fired cartridge case was recovered from the rear seat. There was also a cartridge case that one of the officers guarding the scene had received from Hill. Abuzanat then went to the gas station at 87th and Ashland and took photographs of the premises. He then went to Hill's residence, where he learned that the offender had been smoking a cigarette. He then returned to the gas station and photographed and recovered five cigarette butts from the ground outside the front entrance of the store.

¶ 15    Chicago Police Detective Marc Delfavero testified that on November 3, 2016, he administered the line-up viewed by Hill. Before the line-up, Hill signed an advisory form, and declined to have her viewing of the line-up video or audio recorded. Delfavero then brought Hill into the line-up room, and Hill "looked at the individuals in the line-up, began to cry and pointed to person No. 1 and said that's the person that killed my boyfriend."

¶ 16    Detective Jeremy Morales testified that on November 2, 2016, defendant had been

arrested and was in a room at Area South police headquarters. Defendant was being recorded, as required by law. When Detective Morales went to the room to transport defendant to the lock-up facility, defendant asked Detective Morales if he knew "an Officer White." The conversation was captured on the video recording.

¶ 17     An autopsy showed that the victim suffered from multiple gunshot wounds. One of the gunshot wounds went through the heart, damaging the lungs and the liver. A fired bullet was retrieved from the victim's body. The cause of death was multiple gunshot wounds, and the manner of death of homicide.

¶ 18     Forensic testing revealed the two 9 mm Luger fired cartridge cases recovered from Hill's car were fired from the same firearm; and the fired bullet recovered from the car was fired from the same firearm as the fired bullet recovered from the victim's body.

¶ 19     The State rested. Defendant's motion for directed verdict was denied.

¶ 20     Defendant entered the following stipulations into evidence: Detective Lieber would testify that he conducted the six person photo spread on June 5, 2016, which included a photo of Demetrius Gaddis, wherein Hill related that "she could not identify anyone in the photo array, and that it would be easier if she could view the subjects in person"; Detective Braun would testify that he conducted the six person photo spread on June 14, 2016, which included a photo of defendant wherein Hill could not identify anyone; and Detective Cavazos would testify that Hill told him that the male black standing near the front door of the gas station was smoking a cigarette, and that the same male black asked her if Sellers was her boyfriend but that she did not respond. It was further stipulated that defendant's DNA was not found on any of the five cigarette butts recovered from the ground in front of the gas station.

¶ 21    Defendant was found guilty of first degree murder, and of personally discharging a firearm that caused death. Defendant's motion for a new trial was denied. The court sentenced defendant to 25 years on the first degree murder count in addition to a 25-year mandatory firearm add-on. Defendant's motion to reconsider was denied.

¶ 22    Defendant now appeals.

¶ 23                              ANALYSIS

¶ 24    Defendant first argues that the court erred in denying his motion to suppress Hill's identification as it was unduly suggestive where Hill described the shooter as having a short, curly afro and defendant was the only individual in the lineup who had such a hairstyle.  In addition, in the lineup, defendant wore a bright yellow shirt.

¶ 25    A ruling on a motion to suppress is subject to a mixed standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). The trial court's factual findings are entitled to deference, given that the trial court is in a superior position to weigh the credibility of witnesses, and we will uphold such findings unless they are contrary to the manifest weight of the evidence. *Id*. However, the ultimate legal question of suppression is subject to de novo review. *Id.*

¶ 26    On a motion to suppress identification, the defendant bears the burden of establishing, within the totality of the circumstances, the pretrial identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of an unreliable identification. *People v. Denton*, 329 Ill. App. 3d 246, 250 (2002). Individuals selected for a lineup need not be physically identical. *Id.* "Differences in their appearance go to the weight of the identification, not to its admissibility." *Id.* " 'Only where a pretrial encounter resulting in an identification is 'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial

likelihood of irreparable misidentification' is evidence of that and any subsequent identification excluded by law under the due process clause of the 14th Amendment.' " *People v. Love*, 377 Ill. App. 3d 306, 311 (2007) (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994)). The law does not require the participants in a lineup to be nearly identical, or to exactly match the descriptions given by eyewitnesses. *Love*, 377 Ill. App. 3d at 311. The suggestibility of a lineup depends on " 'the strength of the suggestion made to the witness' " and, whether, through " 'some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities.' " *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (quoting *People v. Johnson*, 149 Ill. 2d 118, 147 (1992)). Courts must examine the totality of the circumstances in determining whether a defendant has met the burden of showing the identification procedure was impermissibly suggestive. *People v. Prince*, 362 Ill. App. 3d 762, 771 (2005). If a defendant satisfies this burden of proof, only then will the burden shift to the State to show, by clear and convincing evidence, an independent basis of reliability for a later identification. *Id*.

¶ 27    In this case, defendant argues that he stood out in the lineup because he was the only individual that matched the description provided by the eyewitnesses; he had a short, curly afro. He also claims that he stood out because police made him wear a yellow shirt and he was the only person wearing dark jeans.

¶ 28    However, there is no evidence in this case that the identification procedures were impermissibly suggestive. The witnesses who viewed the lineup read and signed the lineup advisory forms which informed them that they were not required to make an identification and the offender might not be in the lineup. Our review of a photograph of the lineup participants

shows that the six participants appear to be of the same age and skin tone. All of the participants were of similar height and weight. Three had braids, and three had short hair. Five wore colored shirts and one wore a white shirt. No one in the lineup stood out more than anyone else. See *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57, (lineup participants are not required to be identical or near identical).

¶ 29    The offender was described as wearing a white shirt and dark jeans at the time of the shooting. In the lineup, defendant was not wearing a white shirt and dark jeans.  Instead, he was wearing a yellow shirt and dark jeans that defendant claims that the police gave him to wear because he was in IDOC custody.  The fact that defendant is wearing a yellow shirt does not make the lineup suggestive. In our view, had the police given him a white shirt, defendant would be arguing the lineup was suggestive. In any event, this court has held that a lineup is not suggestive merely because the defendant is the only person wearing a specific item of clothing, even where that piece of clothing was purportedly worn by the offender at the time of the offense. See, e.g., *Gabriel*, 398 Ill. App. 3d at 349 (lineup not overly suggestive where the defendant was the only one wearing a white T-shirt); *People v. Peterson*, 311 Ill. App. 3d 38, 49 (1999) (lineup not unduly suggestive when the defendant was the only one present wearing a gray sweatshirt); and *People v. Faber*, 2012 IL App (1st) 093273 (lineup not suggestive where the defendant was the only participant wearing a sleeveless t-shirt a witness described the offender as wearing). Again, the offender was described as wearing a white shirt during the offense and defendant has failed to advance a convincing argument that wearing a yellow shirt in the lineup, conducted five months after the shooting, is suggestive let alone impermissibly suggestive.

¶ 30    Furthermore, this lineup was not suggestive because defendant was the only participant with a short, curly afro. This court has routinely recognized that a lineup is not impermissibly suggestive where "the defendant was the only person in the lineup with braided hair." *People v. Love*, 377 Ill. App. 3d 306, 311 (2007); see also *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) ("[D]efendant's hairstyles in the lineups (both the french braids and the Afro) were not so distinctive that they rendered the lineups unduly suggestive."); *People v. Trass*, 136 Ill. App. 3d 455, 463 (1985) ("The fact that [defendant] was the only man in the lineup with braided hair does not establish that the lineup was impermissibly suggestive * * *.").

¶ 31    Based on our review of the lineup, as well as relevant case law, we reject defendant's contention that the lineup in this case was impermissibly suggestive. Therefore, we cannot find that the trial court's decision to deny defendant's motion to suppress identification was against the manifest weight of the evidence.

¶ 32    We also reject defendant's argument that that the State cannot demonstrate that Hill's in-court identification was independent from the suggestive lineup, and therefore Hill's in-court identification also requires suppression. As we have found that defendant has not shown that the lineup was suggestive, we need not address this argument.

¶ 33    Next, defendant argues that he was denied his right to confront the witnesses against him where the court barred any inquiry into an identity theft charge that had been brought against Veronica Hill, which was subsequently dismissed, as the charges could have been reinstated at the time of defendant's trial. Defendant claims that less than nine months before his trial, Hill was charged with identity theft and was accused of stealing between $2,000 and $10,000, a Class 2 felony. Three weeks before trial, the State filed a *nolle prosequi* motion, dropping the charge.

¶ 34    Defense counsel sought to introduce this arrest in a pre-trial motion *in limine* as evidence of motive, bias, or interest under *People v. Triplett*. 108 Ill. 2d 463, 475 (1985).  The trial court denied the motion on the grounds that the charge was *nol-prossed*.

¶ 35    A defendant has the constitutional right to confront the witnesses against him, which includes the right to cross-examination of witnesses. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 113. However, the right to cross-examine witnesses is not absolute. *People v. Rendak*, 2011 IL App (1st) 082093, ¶ 23. The trial court, therefore, "has discretion to impose reasonable limits on cross-examination to limit possible harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning." *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007); see also People v. Campbell, 2012 IL App (1st) 101249, ¶ 56 (a trial court may limit questions of minimal relevance). The limits placed on cross-examination rest within the sound discretion of the trial court, and it abuses its discretion only when its limitations result "in manifest prejudice to the defendant." *People v. Hall*, 195 Ill. 2d 1, 23 (2000). "[U]nless the defendant can show his or her inquiry is not based on a remote or uncertain theory, a court's ruling limiting the scope of examination will be affirmed." *Tabb*, 374 Ill. App. 3d at 689.

¶ 36    "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992).  Making an offer of proof is important because it discloses to the trial court and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and because it provides a reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful. *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998); see also *In re Estate of Romanowski*, 329 Ill. App. 3d 769, 773 (2002) ("When a defendant claims that he

has not been given the opportunity to prove his case because the trial court improperly barred evidence, he 'must provide [the] reviewing court with an adequate offer of proof as to what the excluded evidence would have been.' ")). The failure to make an adequate offer of proof results in forfeiture of the issue on appeal. *Andrews*, 146 Ill. 2d at 422; see also *People v. Evans*, 373 Ill. App. 3d 948, 966 (2007) ("Failing to make an adequate offer of proof results in a waiver of the issue on appeal.").

¶ 37    Here, defense counsel did not make an offer of proof to the trial court as to whether Hill had been charged with an unrelated identify theft charge that had been dismissed and how that charge was related to Hill's motive or bias.  In fact, defendant references documents he has attached to his appellate brief, which appear to be a printout of Hill's *nolle prosed* identity theft charge.  These documents are not part of the record on appeal and were never presented to the trial court. Even if the court had had notice of an identity theft charge and its dismissal, there was no offer of proof as to how this dismissed charge would be positively related to Hill's bias or motive to testify falsely.  Absent such an offer of proof, we cannot determine whether the charge existed or whether the exclusion of that evidence was proper. *Andrews*, 146 Ill. 2d at 421-22. Accordingly, defendant has forfeited review of this issue.

¶ 38    Next, defendant argues that he was denied a fair trial where, in denying his motion to excuse a juror for cause because he did not understand English, the trial court ignored the fact that Juror S misunderstood English at least three times during *voir dire* after he informed the court that he had difficulty understanding the constitutional principles enumerated in *People v. Zehr*, 103 Ill. 2d 472, 476 (1984).

¶ 39    Defendant admits that he failed to preserve this issue for review.  Counsel did not object

and defendant did not include this issue in his posttrial motion.  Nonetheless, the defendant urges us to review the issue under the plain error doctrine. The plain error doctrine allows this court to bypass normal forfeiture principles and consider an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Magallanes*, 409 Ill. App. 3d 720, 727-28 (2011). The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred at trial. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58.

¶ 40   During *voir dire*, venireperson S was one of 28 venirepersons called to sit in the "inner" part of the courtroom. The trial court explained to all of the venirepersons that a defendant is "presumed to be innocent" and that the "State has the burden of proving the guilt of the defendant beyond a reasonable doubt." The court explained these principals twice.   The court then asked, "Is there anybody who does not accept nor does not understand that constitutional principle in the inner part of the courtroom, raise your hand?" The trial court then stated unequivocally, "And nobody raised their hand."

¶ 41   Thereafter, the court asked venireperson G whether she "underst[oo]d English." Venireperson G indicated, "not that much," and then the trial court called on Venirepersons C and S for the same reason. Venireperson S indicated that he "underst[oo]d, but not much," and that he had been in this country since 1987.  The court responded, "Well, what we are going to do is wait and see. You have been here 20 something years then. And the attorneys will be asking you questions. They will make the evaluation about whether they are going to excuse you or not." The trial court then asked if anyone in the outer part of the courtroom "does not accept or understand those constitutional principles, please raise your hand?" Two people from the outer

13

part of the courtroom raised their hands, not to say they didn't understand or accept the principles, but to alert the court about potential language problems.

¶ 42    After inquiring of those venirepersons about their English, the trial court confirmed that "nobody in the outer part of the courtroom raised their hands as not accepting nor understanding the principles of presumption of innocence." The trial court again asked, "[i]s there anybody in the inner or outer part of the courtroom that has problems, other than the people that raised their hands about language, applying --- or qualms about applying the constitutional principle, please raise your hand?" The trial court reported, "nobody raised their hand." The court went on to admonish the venire persons of the remaining *Zehr* principles and no one from the inner or outer part of the courtroom indicated that they did not understand or could not apply those principles.

¶ 43    There is no question, based upon the record before us, that the trial court complied with the mandate of Rule 431(b).  The record absolutely establishes that the trial court was extremely diligent in ensuring that all member of the venire, in the inner or outer part of the courtroom, accepted and understood the *Zehr* principles.  There is no indication from the record before us that Juror S was unable to understand and accept the first *Zehr* principal the first time the court explained it and asked if everyone understood and could apply it, before Juror S indicated that he had trouble with English.  The record demonstrates  Juror S was able to articulately answer subsequent questions regarding his prior arrests, where he lived, what he did for a living and what he enjoyed doing outside of work.  As such, defendant has failed to establish any error occurred and plain error analysis in not necessary.

¶ 44    Defendant also faults the trial court for failing to excuse Juror S for cause based on Juror S's difficulty with English.  When the trial court denied defense counsel's motion to dismiss

Juror S for cause, defendant did not use an available preemptory challenge to dismiss Juror S.

¶ 45    A failure to challenge a juror for cause or by peremptory challenge waives any objection to that juror. *People v. Wilson*, 303 Ill. App .3d 1035, 1042 (quoting *People v. Ford*, 19 Ill. 2d 466, 475, 168 N.E.2d 33 (1960) ("We have frequently stated that a defendant, having failed to use his peremptory challenges, is in no position to complain concerning jury selections."))  A defendant cannot claim that an objectionable juror sat on his jury because the trial court failed to excuse the juror for cause when the defendant did not use his peremptory challenges to excuse the juror that he claims should have been excused for cause.  *People v. Pendleton*, 279 Ill. App. 3d at 675, 677 (1996).  Indeed, the decision not to use an available peremptory challenge does not forfeit a challenge to that juror's presence, but actively waives that right.  *People v. Bowens*, 407 Ill. App. 3d 1094, 1100 (2011).  That is because by not giving the court the opportunity to prevent or correct errors at trial, a defendant could obtain a reversal by his intentional failure to act.  See *People v. Robinson*, 299 Ill. App. 3d 426, 436 (1998) (citing *People v. Carlson*, 79 Ill .2d 564, 577 (1980) (where a record shows that defense counsel understood both the availability of peremptory challenges and how to use them, his decision not to use one on a particular juror is an affirmative acquiescence of that juror's jury service, constituting a waiver of the issue)).

¶ 46    Defendant's reliance on *United States v. Martinez-Salazar*, 528 U.S. 304 (2000) is misplaced.   In *Martinez-Salazar*, the defendant used the peremptory challenge at issue to remove a juror he believed should have been struck for cause after the district court denied his for-cause challenge. 528 U.S. at 309. On this basis, the court  unanimously ruled that "Martinez-Salazar did not lose a peremptory challenge." 528 U.S. at 315-16.

¶ 47    Juror S was not forced on the defendant. He had a peremptory challenge left when Juror

S was empaneled and had the opportunity to use it. He did not use it and accepted Juror S without complaint. As defendant actively waived his opportunity use a peremptory challenge to remove Juror S from the jury, defendant cannot now complain of error.

¶ 48    Defendant next argues that he was denied his right to the effective assistance of counsel where counsel failed to introduce evidence concerning an alternative suspect, failed to argue that the identification of the State's only eyewitness was tainted by a prior photo array, failed to renew a motion to suppress identification after the witness's trial testimony, failed to object to highly prejudicial testimony of little probative value, failed to call an expert witness on eyewitness identification, and made numerous errors in closing arguments.

¶ 49    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans,* 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. If it is more convenient for a court to dispose of a claim of ineffective assistance of counsel by determining that the defendant did not suffer sufficient prejudice as a result of counsel's alleged deficient performance, the court may proceed directly to a determination of the second prong of the *Strickland* test without making a decision on the question of competency. *People v. Caballero*, 126 Ill. 2d 248, 260 (1989).

¶ 50    Defendant claims that defense counsel erred by failing to introduce evidence that Hill, the State's only eyewitness, gave the police a Facebook profile and informed them she had a photo of Meechie Gaddis.

¶ 51    We cannot tell from the record before us whether a photograph of Gaddis existed and whether Hill gave it to police. Detective Cavazos testified that Seller's mother called him to come over because she had information to give him, and that Hill was present. According to Cavazos, Hill related to him that she "had" a picture of Gaddis but later clarified that Hill informed him that "Meechie Gaddis on Facebook is the person who they believe is the shooter" based on "word on the street." This is consistent with what defense counsel elicited from Hill, that Hill had "[gone] to the police with the name *** Meechie Gaddis," because Hill "thought that maybe he was the boy standing outside the convenience store."

¶ 52    Defendant's argument that Hill gave police a Facebook photo is based on matters outside the record, making it inappropriate for direct review and better addressed in a postconviction petition. *People v. Newbolds*, 364 Ill. App. 3d 672, 676 (2006) (because reviewing court may not consider matters not of record, a claim that relies on evidence outside the record is not cognizable on direct appeal). Accordingly, we will not consider this claim.

¶ 53    Next, we address defendant's claim that counsel was ineffective for failing to renew his motion to suppress based on Hill's testimony about defendant's hair being different when viewing the Gaddis line-up, because the motion would not have succeeded, and the evidence of defendant's guilt was overwhelming even without Hill's identification of him.

¶ 54    When a defendant seeks to overturn the trial court's denial of his motion to suppress based on later-adduced trial evidence on direct appeal, the defendant could rely on trial evidence

only if he renewed his suppression motion at trial and asked the court to reconsider its earlier ruling. *People v. Causey*, 341 Ill App. 3d 759, 766 (2003). "To successfully assert that counsel was ineffective for failing to [renew a suppression motion at trial], the defendant must show the motion would have been successful, thus affecting the outcome of the trial." *Id*.

¶ 55    Defendant's renewed motion to suppress would not have been successful.  But even assuming *arguendo* that it would have been successful, and Hill's identification would have been suppressed, the video evidence played in open court clearly show defendant boarding the bus, riding the bus, exiting the bus, walking to the gas station, running alongside the victim's car, sticking his arm inside the window, pulling his arm outside the window, running away from the car, running through the parking lot, and running onto the sidewalk. His face, hair style, facial hair, body, body movements, clothing, and shoes, could be clearly seen from multiple angles, including close-ups, on the color video from the bus.  Officer White's identification of defendant from the videos, defendant's acknowledgment of his relationship with White, and the video and photographic evidence  provided overwhelming evidence of defendant's guilt, even without Hill's identification of him. Consequently, even if defendant prevailed on the suppression motion, the outcome of the trial would not have been different.  We cannot say that defendant suffered any prejudice.

¶ 56    Defendant also argues that counsel was ineffective when he failed to object to Officer White's testimony that he was contacted by officers in the gang investigations division in connection with this case. Officer White testified that he "received a text from an officer in the Gang Investigations Division asking me if I knew an individual by the name of Meechie." Defendant argues that White's testimony strongly suggested to the jury that the crime was being

investigated as an act of gang violence, and from that, the jury could infer motive.

¶ 57    Officer Romero testified that he was assigned to the gang investigations unit of the Chicago police department and had previously been assigned to the gang enforcement unit. Detective Cavazos testified that he was assigned to the Area South Bureau of Detectives, Homicide, Gangs and Sex Unit.  Officer White testified that was assigned to the 6th district of the Chicago police department as an intelligence officer and it was his job to gather and disseminate intelligence regarding gang conflicts, violent crimes, and various other types of crimes.  Officer White testified that he was contacted by Officer Romero and was asked to look at a photograph of the shooter.  Officer White was able to identify defendant from the photograph because he knew defendant and had been working with him for two years.

¶ 58    Contrary to defendant's argument, Officer White's testimony regarding being contacted by gang officers was merely to explain steps in the investigation and how he became involved in this case.  Officer Romeo was in fact a member of the gang investigations unit.  There was no testimony or evidence presented that inferred defendant was involved in gang activity. Therefore, defendant suffered no prejudice.

¶ 59    Defendant also faults trial counsel for conceding that defendant was on the CTA bus. The State's theory was that the person on the CTA bus was the shooter in this case. In closing, defense counsel argued that Kennedy was on the bus: "Video evidence in this case will also show you that Veronica Hill and Kori Sellers pull into that gas station before Lamar Kennedy's bus even arrives. Kori Sellers is already in the gas station before Lamar Kennedy even is getting off that bus and walking through the gas station."

¶ 60    Defendant suffered  no prejudice from this remark.  A review of the closing argument

reveals that defense counsel offered several theories of defense to the jury. Counsel offered the jury the idea that defendant was not on the bus, but even if defendant was on the bus, it did not mean that defendant was the shooter. Defense counsel suggested that the shooter could have been someone else in the store. Given the fact that Hill and White positively identified him, defendant cannot establish that counsel's concession was anything but a sound strategic decision in the light of the evidence. Defendant suffered no prejudice here.

¶ 61　Defendant argues that counsel was ineffective for failing to object to the State's argument that Hill looked at the shooter's face. Defendant argues that when asked if she saw "Kori get hit," Hill answered, "Naw. I just looked ahead. I didn't want to look." Defendant claims that his remark amounts an admission by Hill that she never looked at the shooter.

¶ 62　Defendant's argument is a stretch. Hill testified that she did not watch defendant shoot Sellers. Hill never testified that she did not look at the shooter at all during the entire event. The State's remark was a reasonable inference from the evidence. Furthermore, any error was cured when the jury was instructed that closing arguments are not evidence. Defendant suffered no prejudice as a result of defense counsel's failure to object here.

¶ 63　Defendant also claims that counsel was ineffective for failing to call an eyewitness expert because the entire case hinged on the credibility of Hill and White and there was no physical evidence tying him to the crime.

¶ 64　This is not the type of case that expert identification testimony would have been helpful. See *People v. Lerma*, 2016 IL 118496, ¶¶ 24-26. In addition to the identifications made by Hill and White, there were videos and still photographs that captured defendant's movements and actions from the time he was on the bus to the time he fled the scene after the shooting. These

videos and photographs captured defendant committing the crime and allowed for the jury to make its own determination of weight to give this evidence. Therefore, defendant suffered no prejudice as a result of counsel's failure to call an eyewitness expert.

¶ 65 Finally, defendant argues that his *de facto* life sentence of 50 years in prison, for an offense committed when he was 21 years old, is facially unconstitutional for the entire class of young adult defendants who, like defendant, were in their early 20s at the time of their offense, violates both the federal and state constitutions as applied to him, and is excessive in light of his age and mitigating factors.

¶ 66 Despite his claim, defendant's 50-year sentence is not excessive. The trial court must consider both the seriousness of the offense and the defendant's rehabilitative potential at sentencing. Ill. Const. 1970, art. I, § 11. A lower court's sentencing decision is reviewed for abuse of discretion on appeal and is granted considerable deference by the reviewing court. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). This is because the sentencing court is better situated to consider the "defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 67 The sentencing court will be presumed to have considered all relevant factors in mitigation, "absent some indication to the contrary other than the sentence itself." *People v. Thompson*, 222 Ill. 2d 1, 45 (2006). Mitigating factors such as rehabilitative potential are not entitled to greater weight than aggravating factors. *Alexander*, 239 Ill. 2d at 214 (citing *People v. Coleman*, 166 Ill. 2d 247, 261 (1995)). The reviewing court should not substitute its judgment for that of the sentencing court when weighing factors in mitigation and aggravation. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21.

¶ 68    The record reveals that the court specifically stated that it had considered all of the statutory factors in aggravation and mitigation, the presentence investigation report, the live testimony, and the documents submitted on defendant's behalf in regard to his rehabilitation.  In this case, the sentencing range for first degree murder and for personally discharging a firearm that caused death is 45-85 years' imprisonment, or natural life imprisonment.730 ILCS 5/5- 4.5-20(a); 730 ILCS 5/5-8-1(a)(1)(d)(iii)(West 2016).  Therefore, defendant's 50-year sentence is presumptively proper because it is within this range, and "will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 69    Defendant argues that his 50-year sentence violates the eight amendment because it amounts to a *de facto* life sentence.

¶ 70    The eighth amendment's prohibition of "cruel and unusual punishment[ ]" applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *People v. Davis*, 2014 IL 115595, ¶ 18. In *Miller v. Alabama*, 567 U.S. 460, 471-80 (2012), the United States Supreme Court held that mandatory life sentences imposed on juvenile offenders, those under the age of 18 at the time of the offense, violate the eighth amendment because this prevents the sentencing court from considering the mitigating aspects of youth, *i.e.,* their immaturity, impulsivity, and increased vulnerability to negative influences. Our supreme court has since determined that *Miller* applies to mandatory, discretionary, natural, or *de facto* life sentences imposed on juveniles. *People v. Holman*, 2017 IL 120655, ¶¶ 40, 46; *People v. Reyes*, 2016 IL 119271, ¶ 9. It also drew the line for a *de facto* life sentence at 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Accordingly, "to prevail on a claim based on *Miller* and its progeny, a defendant

sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id*. ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40).

¶ 71    In this case it is undisputed that defendant was 21 years old at the time he murdered Sellers.  "By now, it is clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles." *People v. Harris*, 2018 IL 121932, ¶¶ 49-61 (collecting cases and stating that the 19-year-old defendant "cannot avail himself of the eighth amendment" under *Miller*). "[C]laims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Id*. ¶ 61. "It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases." *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 49. Therefore, defendant's eighth amendment challenge fails.

¶ 72    Defendant's as applied challenge to his 50-year sentence under the proportionate penalties clause also fails.  The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our courts have construed the clause to extend greater protections against excessive punishment than the eighth amendment. *People v. Fernandez*, 2014 IL App (1st) 120508. A defendant's sentence violates the proportionate penalties clause where "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). To comply with the proportionate penalties clause, the court

must balance the goals of retribution and rehabilitation, carefully considering all factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). "To determine whether a penalty shocks the moral sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 73    *Miller* has recently been expanded to apply to those over 18. Our supreme court has acknowledged that young adults, at least those who were 20 years of age or younger at the time of their crimes, may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). *People v. Thompson*, 2015 IL 118151, ¶ 44 (19-year-old defendant was "not necessarily foreclosed" from raising claim in postconviction proceedings that sentence was unconstitutional as applied to him), and *People v. Harris*, 2018 IL 121932, ¶ 48 (as-applied, youth-based sentencing claim of 18-year-old defendant was "more appropriately raised" in postconviction proceedings where a factual record could be developed). See also *People v. Evans*, 2021 IL App (1st) 172809, ¶ 16 (our supreme court has "opened the door for young adult offenders to demonstrate that their own specific characteristics at the time of their offense were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in Miller, violates the proportionate penalties clause"); *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 51 ("Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment").

¶ 74    In this case, defendant was shy of 22 years old at the time he murdered Sellers, which

puts him at the very tail end of the group of defendants who have successfully asserted as-applied *Miller*-based claims under the proportionate penalties clause. See *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27 (observing that the *Miller*-based protections "were applied to under-18-year-olds and which have been arguably extended in some cases and statutes to under-21-year-olds"). Defendant fails to provide any authority where a 21-year-old offender received the special considerations set forth in *Miller*. "[Defendant] can point to no case in which an Illinois court has recognized that a life sentence imposed on a young adult—21 or older as [defendant] was—is unconstitutional as applied to that offender under the proportionate penalties clause or the eighth amendment." *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33. "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Id.* "While 21 is undoubtedly somewhat arbitrary, drawing a line there is in keeping with other aspects of criminal law and society's current general recognition that 21 is considered the beginning of adulthood." *Id.* ¶ 34.

¶ 75     Even so, defendant had a *Miller* compliant sentencing hearing. At the sentencing hearing for this almost 22-year-old adult, defendant had the opportunity present any and all evidence he believed mitigated his offense. Defense counsel zealously represented defendant in this respect. As demonstrated by the record, the circuit court explicitly and properly considered all mitigation offered including defendant's social history, education, criminal history, family life and potential for rehabilitation before sentencing defendant to 50 years' imprisonment.

¶ 76     At the sentencing hearing, in aggravation, the court heard live testimony from Kori Sellers' mother, Tansy Sellers, who talked about the unbearable pain defendant's actions caused

her, Kori's grandmother, and Kori's siblings, all of whom he had close bonds with and enjoyed helping.

¶ 77    In mitigation, defendant submitted several documents from the jail: a certificate of participation in the "Beyond My Bars" program; a certificate of completion for a creative writing class; and a certificate of completion of a bible study class. He also submitted a letter written by his aunt that was read into the record.  His aunt expressed that it was hard for defendant to grow up without a father. According to her, defendant "had so much resentment and bitterness that it became a task for him to connect, communicate and reveal his mischief with other people." She stated that defendant had a good heart, was gentle and sweet, helped younger students, and cared for family members. This tragic incident would now leave his children without a father.

¶ 78    Defendant's mother, Milika Huff, then testified that defendant loves his children and their mother, and that now Ms. Huff will now have to care for them all. Defendant also has a twin sister with whom he is close. Ms. Huff and defendant's girlfriend have lost weight, and she has been diagnosed with depression and anxiety.

¶ 79    The PSI reflected that defendant was just shy of 22 years old when he committed this murder. He had been adjudicated delinquent as a juvenile in 2009 for aggravated battery, and in 2012 for battery.  In 2012, he was convicted of robbery and sentenced to two years gang probation.  In 2014, he was convicted of robbery and sentenced again to gang probation to run concurrent with the previous period of probation. He violated both probations and was resentenced to three years in the Illinois Department of Corrections.

¶ 80    Defendant and his twin sister were raised by his mother with his father "in and out of his life."  Defendant described his childhood as "normal. All his basic needs were met and he

26

suffered no abuse or neglect. He received mostly good grades in school, had no special needs for behavioral or learning disorders, but was expelled during his senior year when he was arrested and incarcerated. When not incarcerated, defendant was employed off and on at a temporary employment agency, lived with his mother in a "nice" neighborhood, and received food stamp benefits.

¶ 81    Defendant is unmarried, but in a long-term relationship with the mother of his two children (ages 4 and 1), and parents the 5-year-old his girlfriend had from a previous relationship. Defendant reported he spent all his free time with them and had no other friends. Defendant denied ever belonging to, or associating with a street gang, however, the Chicago Police Department had him listed as a Gangster Disciple.

¶ 82    Defendant denied that he had psychological problems, and denied any substance abuse problems, although he admitted he smoked a "blunt" of marijuana about 4 times per week. Defendant doesn't like the police or the court system and felt, "the police lie about everything."

¶ 83    In arguing aggravation, the State recounted the psychological effects that the victim's death caused to his young siblings, and defendant's criminal history including his 2009 aggravated battery and 2012 battery when he was a juvenile and the two robbery convictions as an adult, wherein he violated his probation and served three years in the penitentiary. The State further argued that a long sentence was necessary to deter others.

¶ 84    Defense counsel's mitigation argument primarily relied on the "mitigation presented in what was presented throughout the course of the presentence investigation." She urged a minimum sentence arguing that defendant was almost 24 years old, and that even the minimum meant he would be imprisoned until he was almost 70 years of age. Counsel further urged the

court to consider "the background of [defendant] or the lack thereof," and the fact that he was the father of three children. In allocution, defendant said he was "sorry for what happened to the victim," but maintained his innocence.

¶ 85    The court then explicitly stated that it had "[t]ak[en] into consideration the statutory factors in aggravation, the statutory factors in mitigation, also [defendant's] age, the documents that have been submitted on his behalf and the factors are available for his rehabilitation and also the presentence investigation." The court discussed the impact on the victim's family, defendant's family, and the senselessness of the crime, before sentencing defendant to 25 years imprisonment, on the first degree murder conviction, and 25 years imprisonment for personally discharging a firearm that caused death, to be served consecutively.

¶ 86    As in *People v. Croft*, 2018 IL App (1st) 150043, *appeal denied*, 98 N.E. 2d 28 (2018), *cert denied* 139 S. Ct. 291 (2018), the trial court in this case had before it the trial testimony, the evidence, defendant's presentence investigation, and the sentencing arguments of the parties before it sentenced defendant. As a result, the trial court considered the same factors the *Holman* court found to be constitutionally consistent with *Miller*. Clearly, defendant was afforded the opportunity to develop a factual record in an effort to show that his specific characteristics were so like those of a juvenile that the sentence imposed violated the proportionate penalties clause, absent the safeguards set forth in *Miller. People v. Lusby*, 2020 IL 124046. Given the record and our analysis set forth above, defendant's sentence does not shock the moral sense of the community in violation of the proportionate penalties clause.

¶ 87    As defendant's as applied challenge fails, so does his facial challenge as there is necessarily at least one circumstance in which the statute or ordinance is constitutional. *In re*

*M.T.*, 221 Ill.2d 517, 533 (2006) (and cases cited therein). We need not discuss the merits of this as applied challenge.

¶ 88    Defendant's argument that the 25-year firearm enhancement and the Truth in Sentencing Act as applicable to the offense of first-degree murder is facially unconstitutional under the proportionate penalties clause of the Illinois Constitution for the entire class of young adult defendants who, like defendant were in their early 20s at the time of their offense, also fails for reasons already stated.

¶ 89    "A party raising a facial challenge must establish that the statute is unconstitutional under any possible set of facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *People v. Harris*, 2018 IL 121932, ¶ 38. Defendant asserts that a facial challenge includes a challenge to the constitutionality of a statute as to an entire class of people. See *id.*, ¶¶ 70, 73 (Burke, J., specially concurring) (constitutional claim brought against a mandatory minimum sentence is typically labeled a facial challenge; the defendant raised a facial challenge where he argued that it was unconstitutional to sentence anyone younger than 21 to a mandatory life sentence for any crime). A party may challenge the constitutionality of a statute at any time. *People v. Wagener*, 196 Ill. 2d 269, 279 (2001). Whether a statute is unconstitutional is a question of law that we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 90    Under the proportionate penalties clause, defendant seeks to extend the principles espoused in the *Miller* line of cases, to young adults in their early 20s. As stated, our supreme court has allowed young adults between the ages of 18 and 20 to raise as-applied challenges to their sentences under the proportionate penalties clause, in that "their own specific characteristics

at the time of their offense were so like those of a juvenile that *** a life sentence, absent the safeguards established in *Miller*," violates the proportionate penalties clause. *People v. Ross*, 2020 IL App (1st) 171202, ¶ 18. However, there is no basis, nor does defendant cite one, to expand *Miller* and its progeny to deem the statutory scheme at issue unconstitutional on its face for all defendants in their early 20s.   As the State points out, multiple statutes support the age of 21 as the dividing line between young adults and fully mature adults. See e.g., 730 ILCS 5/5-4.5-115(b) (West 2020) (addressing special parole provisions for people who were under 21 years old at the time of the offense); 730 ILCS 5/5-4.5-95(b) (Class X sentencing applies to defendants over the age of 21); 705 ILCS 405/5-755 (West 2020) (duration of wardship proceedings terminate at the age of 21); 720 ILCS 675/1 (West 2020) (prohibiting sale of tobacco products, electronic cigarettes, and alternative nicotine products to people under 21); 760 ILCS 20/2 (West 2020) (defining an adult in the Uniform Transfers to Minor Act as "an individual who has attained the age of 21 years").  We reject defendant's claim that the statutory scheme under which he was sentenced is facially unconstitutional.

¶ 91                                    CONCLUSION

¶ 92    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 93    Affirmed.